1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    UNITED STATES,                          No.  1:15-cr-00300-DAD-BAM

12              Plaintiff,

13         v.                                 ORDER DENYING DEFENDANT'S
                                              EMERGENCY MOTION FOR
14    STEPHEN MICHAEL FLECK,                  MODIFICATION OF SENTENCE UNDER 18
                                              U.S.C. § 3582(c)(1)(A)
15              Defendant.
                                              (Doc. Nos. 168, 173)
16

17

18         Pending before the court is a motion for a reduction of sentence pursuant to 18 U.S.C.

19    § 3582(c)(1)(A) brought on behalf of defendant Stephen Michael Fleck.  (Doc. No. 168.)  That

20    motion is based in part on the purported risks allegedly posed to defendant Fleck by the ongoing

21    coronavirus ("COVID-19") pandemic.  For the reasons explained below, defendant's motion will

22    be denied.

23                                   **BACKGROUND**

24         On November 14, 2016, following his plea of guilty to one count of conspiracy to

25    distribute heroin in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(C), the court sentenced

26    defendant Fleck to a term of 151 months in the custody of the U.S. Bureau of Prisons ("BOP"),

27    followed by a term of supervised release of 60 months.  (Doc. Nos. 110, 115.)  The court also

28    imposed the mandatory $100 special assessment.  (Doc. No. 115 at 6.)

                                            1

1    Defendant is currently incarcerated at Federal Correctional Institution Lompoc ("FCI

2  Lompoc"). (Doc. No. 173 at 2.) As of the date of this order, defendant Fleck has served

3  approximately 61 months of his 151-month custodial sentence.[1] (Doc. No. 174 at 10.)

4    On approximately May 5, 2020, defendant Fleck tested positive for COVID-19. (Doc.

5  No. 173 at 5.). Defendant and his medical records provide conflicting information regarding

6  whether his infection was symptomatic. (*Id.* at 5–6; Doc. No. 173-3 at 21–22.) Defendant was

7  deemed by the BOP to have recovered from the virus on May 19, 2020. (Doc. No. 173-3 at 35.)

8    On June 5, 2020, defendant filed a *pro se* motion seeking a reduction of his sentence

9  pursuant to 18 U.S.C. § 3582(c)(1)(A). (Doc. No. 168.) The court then referred defendant's

10  motion to the Federal Defender's Office ("FDO"). (Doc. No. 169.) On August 24, 2020,

11  appointed counsel filed a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) on

12  behalf of defendant Fleck. (Doc. No. 173.) The government filed its opposition to the pending

13  motion on September 28, 2020. (Doc. No. 174.) Counsel on behalf of defendant Fleck did not

14  file a reply in support of the pending motion.

15                                         **LEGAL STANDARD**

16    A court generally "may not modify a term of imprisonment once it has been imposed."

17  18 U.S.C. § 3582(c); *see also Dillon v. United States*, 560 U.S. 817, 824 (2010) ("'[A] judgment

18  of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may

19  not be modified by a district court except in limited circumstances."). Those limited

20  circumstances include compassionate release in extraordinary cases. *See United States v. Holden*,

21  452 F. Supp. 3d 964, 968 (D. Or. 2020). Prior to the enactment of the First Step Act of 2018

22  ("the FSA"), motions for compassionate release could only be filed by the BOP. 18 U.S.C.

23  § 3582(c)(1)(A) (2002). Under the FSA, however, imprisoned defendants may now bring their

24  own motions for compassionate release in the district court. 18 U.S.C. § 3582(c)(1)(A) (2018).

25  In this regard, the FSA specifically provides that a court may

26  /////

27  _____

28  [1]  This 61–month approximation of the time defendant has already served accounts for good time
credits he has earned. (*See* Doc. No. 174-1 at 2–4.)

2

1
2
3
4
5

upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf[2] or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable, if it finds that –

6
7

    (i)     extraordinary and compelling reasons warrant such a reduction; or

8
9
10
11

    (ii)    the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

12
13

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

14

18 U.S.C. § 3582(c)(1)(A)(i) and (ii).[3]

15
16
17
18
19
20

[2] If the BOP denies a defendant's request within 30 days of receipt of such a request, the defendant must appeal that denial to the BOP's "Regional Director within 20 calendar days of the date the Warden signed the response." 28 C.F.R. § 542.15(a). If the regional director denies a defendant's administrative appeal, the defendant must appeal again to the BOP's "General Counsel within 30 calendar days of the date the Regional Director signed." *Id.* "Appeal to the General Counsel is the final administrative appeal." *Id.* When the final administrative appeal is resolved, a defendant has "fully exhausted all administrative rights." *See* 18 U.S.C. § 3582(c)(1)(A).

21
22
23
24
25
26
27
28

[3] Under 18 U.S.C. § 3624(c)(2), the BOP may release an incarcerated defendant to home confinement "for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." The Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act"), Pub. L. 116-136, expands the BOP's authority to release incarcerated defendants without judicial intervention. The CARES Act allows the BOP to "lengthen the maximum amount of time" for which a prisoner may be placed in home confinement under § 3624(c)(2) "as the Director determines appropriate," assuming "the Attorney General finds that emergency conditions will materially affect the functioning" of the BOP. CARES Act, Pub. L. 116-136, Div. B, Title II, § 12003(b)(2) (2020). However, the BOP's authority in this regard is limited to "the covered emergency period." *Id.* The BOP's authority expires "30 days after the date on which the national emergency declaration terminates." *Id.* § 12003(a)(2). After the CARES Act was enacted, the Attorney General issued a memo instructing the BOP to "immediately review all inmates who have COVID-19 risk factors" beginning with those who are housed at facilities where "COVID-19 is materially affecting operations." Office of Att'y Gen., *Increasing Use of*

3

1    The applicable policy statement with respect to compassionate release in the U.S.

2    Sentencing Guidelines sets out criteria and circumstances describing "extraordinary and

3    compelling reasons."  U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 1B1.13[4]; *see also*

4    *United States v. Gonzalez*, No. 2:18-cr-00232-TOR, 2020 WL 1536155, at *2 (E.D. Wash. Mar.

5    31, 2020) (noting that courts "universally" rely on U.S.S.G. § 1B1.13 to define "extraordinary

6    and compelling reasons," even though that policy statement was issued before Congress passed

7    the FSA and authorized defendants to file compassionate release motions).  However, a large and

8    growing number of district courts across the country have concluded that because the Sentencing

9    Commission has not amended the Guidelines since the enactment of the FSA, courts are not

10   limited by the pre-FSA categories described in U.S.S.G. § 1B1.13 in assessing whether

11   extraordinary and compelling circumstances are presented justifying a reduction of sentence

12   under 18 U.S.C. § 3582(c).  *See, e.g.*, *United States v. Parker*, 461 F. Supp. 3d 966, 978–79 (C.D.

13   Cal. 2020) (collecting cases); *United States v. Rodriguez*, 424 F. Supp. 3d 674, 681 (N.D. Cal.

14   2019).

15   In the past, when moving for relief under 18 U.S.C. § 3582(c), it was recognized that the

16   defendant bore the initial burden of demonstrating that a sentence reduction was warranted.  *See*

17   *United States v. Sprague*, 135 F.3d 1301, 1306–07 (9th Cir. 1998).  Although the Ninth Circuit

18   has not specifically addressed the question of which party bears the burden in the context of a

19   motion for compassionate release brought pursuant to § 3582(c) as amended by the FSA, district

20

21   *Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020).  The BOP has
     acted on the Attorney General's guidance, including one case in which a sentenced prisoner was

22   released to home confinement after serving less than half his sentence from a facility that reported
     no positive COVID-19 cases at the time of his release.  *See* Hannah Albarazi, *Paul Manafort*

23   *Seeks Prison Release Over COVID-19 Fears*, LAW360 (Apr. 14, 2020), https://www.law360.
     com/articles/1263706/paul-manafort-seeks-prison-release-over-covid-19-fears (noting that the

24   prisoner's counsel had argued that the CARES Act "broadens the authority" of the BOP to release
     prisoners to home confinement); Khorri Atkinson, *Paul Manafort Released From Prison Amid*

25   *COVID-19 Fears*, LAW360 (May 13, 2020), https://www.law360.com/articles/1273090/paul-
     manafort-released-from-prison-amid-covid-19-fears.

26

27   [4] The Sentencing Guidelines also require that to be granted a reduction of sentence under 18
     U.S.C. § 3582(c)(1)(A), the defendant must not pose "a danger to the safety of any other person

28   or to the community, as provided in 18 U.S.C. § 3142(g)."  U.S.S.G. § 1B1.13(2).

1  courts to have done so agree that the burden remains with the defendant. *See, e.g.*, *United States*

2  *v. Greenhut*, No. 2:18-cr-00048-CAS, 2020 WL 509385, *1 (C.D. Cal. Jan. 31, 2020); *United*

3  *States v. Van Sickle*, No. 18-cr-0250-JLR, 2020 WL 2219496, *3 (W.D. Wash. May 7, 2020).

4  **ANALYSIS**

5  As district courts have summarized, in analyzing whether a defendant is entitled to

6  compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), the court must determine whether a

7  defendant has satisfied three requirements:

8
9
10
11
12

> First, as a threshold matter, the statute requires defendants to exhaust administrative remedies.  18 U.S.C. § 3582(c)(1)(A).  Second, a district court may grant compassionate release only if "extraordinary and compelling reasons warrant such a reduction" and "that such reduction is consistent with applicable policy statements issued by the Sentencing Commission. *Id*.  Third, the district court must also consider "the factors set forth in Section 3553(a) to the extent that they are applicable." *Id*.

13  *Rodriguez,* 424 F. Supp. 3d at 680; *see also United States v. Ramirez-Suarez*, No. 16-cr-00124-

14  LHK-4, 2020 WL 3869181, at *2 (N.D. Cal. July 9, 2020); *Parker*, 461 F. Supp. 3d at 973–74;

15  *United States v. Trent*, No. 16-cr-00178-CRB-1, 2020 WL 1812242, at *2 (N.D. Cal. Apr. 9,

16  2020) (noting that as to the third factor, under 18 U.S.C. § 3582(c)(1)(A) release must be

17  "consistent with" the sentencing factors set forth in §3553(a)).

18  **A.      Administrative Exhaustion**

19  Defendant Fleck asserts, and the government does not dispute, that he exhausted his

20  administrative remedies prior to filing his pending § 3582 motion. (Doc. Nos. 173 at 16; 174 at

21  10.)  The court will accept the government's concession and below will turn to the merits of

22  defendant's motion.[5]

23

---

[5]  On June 2, 2020, defendant filed his *pro se* motion with the court. (Doc. No. 168.)  Defendant
then filed a request for a reduction of term of imprisonment on June 2, 2020 and submitted a
request to the Warden of FCI Lompoc on June 6, 2020.  (Doc. Nos. 173 at 16; 174-1 at 6.)
Defendant's request was denied by the Warden on August 11, 2020.  (Doc. Nos. 173 at 16; 174-1
at 7.)  Thus, defendant Fleck filed his original *pro se* motion prior to seeking administrative relief.
However, the motion for compassionate release by his appointed counsel was filed after his
administrative request was submitted and more than 30 days had passed without a response
thereto.  Finally, because a failure to exhaust administrative remedies is normally viewed as an
affirmative defense, the court will adopt the government's concession of exhaustion.

1    **B.      Extraordinary and Compelling Reasons**

2              According to the Sentencing Commission's policy statement, "extraordinary and

3    compelling reasons" warranting compassionate release may exist based on a defendant's medical

4    conditions, age and other related factors, family circumstances, or "other reasons."  U.S.S.G.

5    § 1B1.13, cmt. n.1 (A)–(D).  Even though the catch-all of "other reasons" was included in the

6    policy statement at a time when only the BOP could bring a compassionate release motion, courts

7    agreed that it may be relied upon by defendants bringing their own motions for reductions in their

8    sentence under the FSA.  *See, e.g.*, *United States v. Kesoyan*, No. 2:15-cr-00236-JAM, 2020 WL

9    2039028, at *3–4 (E.D. Cal. Apr. 28, 2020) (collecting cases).

10             The medical condition of a defendant may warrant the granting of compassionate release

11   by the court where the defendant "is suffering from a terminal illness (i.e., a serious and advanced

12   illness with an end of life trajectory)," though "[a] specific prognosis of life expectancy (i.e., a

13   probability of death within a specific time period) is not required."  U.S.S.G. § 1B1.13, cmt.

14   n.1(A)(i).  Non-exhaustive examples of terminal illnesses that may warrant a compassionate

15   release "include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage

16   organ disease, and advanced dementia."  *Id*.  In addition to terminal illnesses, a defendant's

17   debilitating physical or mental condition may warrant compassionate release, including when:

18                        The defendant is

19                        (I)  suffering from a serious physical or medical condition,

20                        (II)  suffering from a serious functional or cognitive impairment, or

21                        (III) experiencing deteriorating physical or mental health because of
                          the aging process,

22

                          that substantially diminishes the ability of the defendant to provide
23                        self-care within the environment of a correctional facility and from
                          which he or she is not expected to recover.

24

25   *Id*. at cmt. n.1(A)(ii).  Where a defendant has moderate medical issues that otherwise might not be

26   sufficient to warrant compassionate release under ordinary circumstances, many courts have

27   concluded that the risks posed by COVID-19 may tip the scale in favor of release when the

28   particular circumstances of a case are considered in their totality.  *See, e.g.*, *Parker*, 2020 WL

1  2572525, at *9–10 ("Since the onset of the COVID-19 pandemic, courts have determined that

2  inmates suffering from conditions such as hypertension and diabetes are now at an even greater

3  risk of deteriorating health, presenting 'extraordinary and compelling' circumstances that may

4  justify compassionate release.") (collecting cases); *United States v. Rodriguez*, No. 2:03-cr-

5  00271-AB, 2020 WL 1627331, at *10–11 (E.D. Pa. Apr. 1, 2020) ("Without the COVID-19

6  pandemic—an undeniably extraordinary event—Mr. Rodriguez's health problems, proximity to

7  his release date, and rehabilitation would not present extraordinary and compelling reasons to

8  reduce his sentence.  But taken together, they warrant reducing his sentence.").

9          Compassionate release may also be warranted based on a defendant's age and other

10  related factors.  Thus, "extraordinary and compelling reasons" exist where a "defendant (i) is at

11  least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because

12  of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of

13  imprisonment, whichever is less."  U.S.S.G. § 1B1.13, cmt. n.1(B).[6]

14          Here, defendant Fleck argues that extraordinary and compelling reasons warranting

15  reduction of his custodial sentence exist because of his advanced age of 66 years old and the fact

16  that he has already contracted and experienced a symptomatic case of COVID-19 while

17  incarcerated at FCI Lompoc.  (Doc. No. 173 at 4–5, 17.)  As noted above, defendant tested

18  positive for COVID-19 on May 5, 2020  (*Id.* at 4.)  Defendant states that he did not have any

19  other underlying condition, such as asthma, when he contracted the virus. (*Id.* at 23.)  According

20  to defendant, he has since experienced heaviness, sluggishness, and difficulty breathing that he

21  fears is irreparable damage caused by his COVID-19 infection but that has not confirmed by

22  medical tests "because FCI Lompoc is barely managing the suppression of the spread of the virus

23  and immediate care to those infected."  (*Id.* at 4–5) (citing Doc. No. 173-1).  The court notes,

24  however, that the medical records attached to defendant's pending motion appear to indicate that

25  during each of the eleven times BOP medical staff have screened defendant Fleck, he denied

26

27  [6]  This provision, however, does not apply here.  Although defendant Fleck is 66 years old, as
    noted above, he has now served only 61 months of his 151-month custodial sentence. (*See* Doc.
28  Nos. 174 at 22.)

7

1  suffering any symptoms.  (*See* Doc. No. 173-3 at 21–22.)  Additionally, defendant was diagnosed

2  with hypothyroidism while serving his current term of in prison, and that condition is currently

3  being treated at FCI Lompoc.  (Doc. No. 173 at 4; *see also* Doc. No. 173-3 at 35.)

4        Defendant Fleck also argues that he is unable to provide self-care while housed at FCI

5  Lompoc because "[h]e must live, work, and sleep in close proximity to others and circulate in

6  crows at a prison teeming with COVID-19 cases."  (Doc. No. 173 at 21.)

7

8

9

10

11

> Mr. Fleck states that social distancing is an impossibility, with beds being around 31 inches apart and all in an open dorm. *See* Ex. A. Inmates are completely locked down and unable to go outside for fresh air or sunlight. *Id.* The dormitory doors, which would normally be open to allow for fresh air and cross ventilation, are kept closed and locked, ensuring that inmates continue to breathe in the same fetid air where coronavirus aerosols stay in the air. *Id.* Community showers are still in use. *Id.*

12  (*Id.*) (citing Doc. No. 173-1).

13        In its opposition, the government argues that defendant has failed to carry his burden of

14  demonstrating that a sentence reduction is warranted in his case because the mere existence of

15  COVID-19 in society or at the correctional institution where he is imprisoned is not an

16  extraordinary and compelling reason justifying the granting of the requested relief, and defendant

17  does not suffer from conditions recognized by the Centers for Disease Control ("CDC") as

18  placing him at high-risk of suffering severe illness should he again contract the virus.  (Doc. No.

19  173 at 14.)  The government does concede that defendant Fleck's age increases his risk of severe

20  illness from COVID-19 under CDC guidelines.  (*Id.* at 15.)  Nonetheless, the government cites to

21  various district courts that have denied motions for compassionate release where only the

22  defendant's age rendered him more vulnerable to COVID-19.  (*Id.* at 16) (citing cases).  While

23  acknowledging that defendant Fleck contracted and recovered from COVID-19, the government

24  notes that many courts have denied compassionate relief where the moving defendant had

25  recovered from COVID-19 infection without suffering a severe illness.  (*Id.* at 16–17) (citing

26  cases).  The government also observes that district courts have rejected the argument that a mere

27  fear of infection, or the risk of re-infection, are extraordinary and compelling circumstances.  (*Id.*

28  at 17–18) (citing cases).  The government also notes that defendant Fleck does not suffer from a

1 | terminal illness, nor does he presently have any condition that diminishes his ability to provide

2 | self-care within the prison at which he is incarcerated.  (*Id.* at 14.)

3 | As an initial matter, the undersigned does not discount the possibility of reinfection from

4 | the COVID-19 virus.  As one district court has observed:  "Without scientific conclusions as to

5 | whether reinfection is possible or how long COVID-19 immunity lasts, [courts have] err[ed] on

6 | the side of caution to avoid potentially lethal consequences."  *United States v. Yellin*, No. 3:15-cr-

7 | 3181-BTM-1, 2020 WL 3488738, at *13 (S.D. Cal. June 26, 2020); *see also United States v.*

8 | *Hanson*, No. 6:13-cr-00378-AA-1, 2020 WL 3605845, at *4 (D. Or. July 2, 2020) ("[T]here is no

9 | current scientific evidence to indicate that a 'recovered' COVID-19 patient is immune from

10 | reinfection, as several courts have recently acknowledged."); *but see United States v. Molley*, No.

11 | 15-cr-0254-JCC, 2020 WL 3498482, at *3 (W.D. Wash. June 29, 2020) (concluding that the

12 | uncertainty surrounding the danger of re-infection with COVID-19 "cuts against compassionate

13 | release," in part because it is the defendant's burden to establish that "extraordinary and

14 | compelling" reasons for release exist).  Erring on the side of caution, the court finds that

15 | defendant's fear of reinfection from COVID-19, and the potential consequences to him were that

16 | to occur, to be potentially well-placed.  Nevertheless, as explained below, the court does not find

17 | that compelling or extraordinary reasons warrant a reduction in defendant's sentence at this time.

18 | As noted above, the parties do not dispute that according to CDC, people of defendant's

19 | age are at an increased risk of suffering a severe illness from the virus that causes COVID-19.

20 | *See Older Adults*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/

21 | 2019-ncov/need-extra-precautions/older-adults.html (last updated September 11, 2020); ("Severe

22 | illness means that the person with COVID-19 may require hospitalization, intensive care, or a

23 | ventilator to help them breathe, or they may even die.").  Although defendant represents that he

24 | may have suffered irreparable damage from contracting COVID-19 while imprisoned, there is no

25 | evidence presently before the court that supports that speculative assertion.  Moreover, the

26 | government is correct that under the definition appearing in CDC's guidelines, defendant has not

27 | suffered severe illness from his bout with COVID-19.  *See Older Adults*, Centers for Disease

28 | Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-

1   precautions/older-adults.html (last updated September 11, 2020); ("Severe illness means that the

2   person with COVID-19 may require hospitalization, intensive care, or a ventilator to help them

3   breathe, or they may even die.").  Moreover, the CDC does not recognize hypothyroidism as a

4   health condition that places one at an increased risk of suffering severe illness from COVID-19.

5   *See People with Certain Medical Conditions, Centers for Disease Control and Prevention*,

6   https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-

7   conditions.html (last updated November 2, 2020).

8          The court need not decide, however, whether defendant's alleged damage from his bout of

9   COVID-19 or his hypothyroidism increase his risk of suffering severe illness from COVID-19,

10  because even if they do, defendant Fleck has not shown that FCI Lompoc is presently unable to

11  monitor and adequately treat his medical conditions.  *See United States v. Ayon-Nunez*, No. 1:16-

12  cr-00130-DAD, 2020 WL 704785, at *3 (E.D. Cal. Feb. 12, 2020) ("Chronic conditions that can

13  be managed in prison are not a sufficient basis for compassionate release.") (internal quotation

14  marks and citation omitted); *see also United States v. McCollough*, No. 15-cr-00336-001-PHX-

15  DLR, 2020 WL 2812841, at *2 (D. Ariz. May 29, 2020) ("Since Defendant has contracted

16  COVID-19, the relevant questions concern (1) the course of his illness, (2) the state of his health,

17  (3) his prognosis, and (4) the adequacy of the care and treatment being provided to him in BOP

18  given his pre-existing conditions. . . .  There is no evidence that the circumstances surrounding

19  Defendant's health or treatment are extraordinary or compelling.").  After testing positive for

20  COVID-19 on May 5, 2020, defendant received regular monitoring by BOP medical staff for

21  symptoms until May 19, 2020, when he was apparently deemed by the BOP to have recovered

22  from the virus.  (*See* Doc. No. 173-3 at 21–22.)  Moreover, defendant concedes that his

23  hypothyroidism condition is being treated at FCI Lompoc.  (*See* Doc. No. 173 at 4.)

24          As one court has acknowledged, "the presence of COVID 19 . . . necessitates a more

25  expansive interpretation of what self-care means" and thus the inability of individuals at high risk

26  of becoming severely ill from COVID-19 to practice appropriate hygiene, wear a mask and

27  maintain social distancing may constitute an inability to provide self-care under some

28  circumstances.  *United States v. Gorai*, No. 2:18-cr-00220-JCM, 2020 WL 1975372, at *3 (D.

1   Nev. April 24, 2020)) (citation omitted).  However, here, defendant Fleck has not persuasively

2   argued that he is being prohibited from taking appropriate precautions to avoid contracting

3   COVID-19 once again or that his ability to provide self-care at FCI Lompoc is currently

4   substantially diminished.  Although defendant has described the close proximity of the other

5   inmates with whom he is housed, the fact that the prison's lockdown promotes the sharing of air,

6   and the fact that community showers, toilets, and sinks are still in use at FCI Lompoc (Doc. No.

7   173-1 at ¶¶ 20–21), he has not made any specific allegations regarding, for instance, his lack of

8   access to protective gear or cleaning and sanitizing supplies.  In its opposition to the pending

9   motion, the government relies upon the May 21, 2020 declaration of Lawrence Cross, the Health

10  Services Administrator overseeing Federal Correctional Complex ("FCC") Lompoc.[7]  (Doc. No.

11  174 at 12.)[8]  Among other things, declarant Cross therein describes that FCC Lompoc inmates are

12  provided access to cleaning supplies, including their own personal bottle of disinfectant; that

13  medical staff perform daily symptom and temperature checks of every housing unit; and the

14  resources available for treatment, including an on-site Hospital Care Unit or, if intensive-care

15  level services are needed, transfer to a local hospital.  *See United States v. Eddings*, 2:09-cr-

16  00074-JAM, Doc. No. 340-1 at ¶¶ 5–8, 10–12.

17          The court certainly recognizes that FCI Lompoc initially failed to control the outbreak of

18  COVID-19 at that institution, as a high number of its inmates tested positive for the virus.  *See*

19  *United States v. Schweder*, No. 2:11-cr-00449-KJM, 2020 WL 5257598, at *5 (E.D. Cal. Sept. 3,

20  2020) ("Other district courts have found USP Lompoc to be suffering a particularly bad outbreak.

21  Earlier this year, another district court in the Ninth Circuit called FCI Lompoc 'among the worst

22  coronavirus hotspots in the nation.'") (citing *United States v. Robinson*, No. 18-cr-00597-RS-1,

23

24  [7]  FCC Lompoc is divided into three facilities:  FCI Lompoc; United States Penitentiary, Lompoc;
    and a satellite prison camp.  *United States v. Eddings*, 2:09-cr-00074-JAM, Doc. No. 340-1 at ¶ 3.
25

26  [8] This declaration addressing the COVID-19 related precautions that were then being taken at
    FCC Lompoc and was filed in the case of *United States v. Eddings*, 2:09-cr-00074-JAM (E.D.
27  Cal.), Doc. No. 340-1.  The court, in that case, relied upon that declaration in denying defendant
    Eddings' motion for compassionate release.  *See United States v. Eddings*, 2:09-cr-00074-JAM,
28  Doc. No. 345 at 5.

1    2020 WL 1982872, at *1 (N.D. Cal. April 27, 2020)); (Doc. No. 173 at 14–15).  That situation

2    was obviously an extremely serious one.  But it appears that the active COVID-19 virus cases at

3    FCI Lompoc have decreased significantly since the pandemic began.  When defendant filed his

4    motion on August 24, 2020, he stated that 818 inmates of 1046 imprisoned at FCI Lompoc had

5    tested positive for the virus and that 590 staff members there had tested positive as well.  (Doc.

6    No. 173 at 13.)  When the government filed its opposition to defendant's motion on September

7    28, 2020, the BOP was reporting four inmate deaths and seven confirmed then-active COVID-19

8    cases among prisoners or staff.  As of November 20, 2020, however, the BOP reports that two

9    inmates and only one staff member at that prison are now confirmed as having active cases of

10   COVID-19 cases, with no additional deaths.  *See* https://www.bop.gov/coronavirus/ (last

11   reviewed November 20, 2020).[9]

12          In light of all the above, the court concludes that defendant Fleck has not met his burden

13   of demonstrating extraordinary and compelling reasons for his compassionate release under

14   § 3582(c)(1)(A).  Therefore, his motion will be denied.

15   **C.     Consistency With the § 3553(a) Factors**

16          Finally, even if defendant Fleck's motion was supported by a showing of extraordinary

17   and compelling reasons supporting his compassionate release, the undersigned is not persuaded

18   that the requested reduction in his sentence would be consistent with consideration of the

19   sentencing factors set forth at 18 U.S.C. § 3553(a).[10]  *See Parker*, 461 F. Supp. 3d at 981–83.

20   

21   [9] The undersigned does not necessarily accept the numbers of reported cases at any institution at
     face value given the manner in which the CDC guidelines apparently allow for individuals to be
22   counted as recovered from the virus without confirming test results.  Nonetheless, there is also no
     evidence before the court contradicting those reported numbers and at this juncture, defendant
23   Fleck has not persuaded the court that FCI Lompoc is unable to adequately monitor his condition
     and care for him.
24   

25   [10] Title 18 U.S.C. § 3553(a) provides that, in determining the sentence to be imposed, the court
     shall consider:  the nature and circumstances of the offense and the history and characteristics of
26   the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote
     respect for the law, provide just punishment for the offense, afford adequate deterrence, protect
27   the public from further crimes of the defendant and provide the defendant with needed
     educational or vocational training, medical care, or other correctional treatment in the most
28   effective manner; the kinds of sentences available; the kinds of sentence and the sentencing range

1   As noted above, defendant Fleck is currently serving a 151-month sentence of

2   imprisonment for conspiracy to distribute heroin in violation of 21 U.S.C. §§ 846, 841(a)(1) and

3   (b)(1)(C).  (Doc. No. 115.)  At the time of his sentencing on November 14, 2016, he was found to

4   be responsible for approximately 119 grams of morphine that were intended to be converted into

5   heroin.  (Doc. No. 102 at 9.)  With his early acceptance of responsibility, the U.S. Probation

6   Office determined that his total offense level was 29 and that his criminal history placed him in

7   criminal history category VI, resulting in an advisory sentencing guideline range calling for a

8   term of imprisonment of between 151 to 188 months.  (*Id*. at 10–12, 15.)  The probation officer

9   recommended a low-end of the guideline range sentence of 151 months in BOP custody.  (*Id*. at

10   19.)  After considering all of the applicable § 3553(a) factors and the circumstances of this case,

11   the undersigned sentenced defendant to a 151-month term of imprisonment.  (Doc. No. 115 at 2.)

12   In his pending motion, defendant contends that "[a]lthough the circumstances of the

13   present offense qualified [him] for the serious sentence this Court originally imposed, the

14   sentencing purpose of just punishment does not warrant a sentence that includes exposure to a

15   life-threatening illness."  (Doc. No. 173 at 24.)  Defendant Fleck states that he has a release plan

16   that entails returning to the home of his sister, who is committed to his betterment and success

17   and recognizes that he will be financially dependent on her until he can secure employment.

18   (Doc. No. 173 at 8–10, 24.)  In this regard, it is proffered that defendant's sister will provide him

19   a spare bedroom at her home and a loan him the use of a vehicle to take advantage of any

20   employment opportunities that arise for defendant.  (*Id.* at 10.)  According to defendant, his sister

21   hopes to help him secure employment in the college where she instructs or a neighboring facility.

22   (*Id.* at 24.)  She and her husband reside in a rural part of Pennsylvania on a 6-acre property, and

23   defendant contends that the ruralness will ensure that he will not pose a danger to that

24   community.  (*Id.* at 24–25.)  Defendant's sister also lives about 15–30 minutes away from a

25

26   established for the applicable category of offense committed by the applicable category of
defendant as set forth in the guidelines; any pertinent policy statement issued by the Sentencing
27   Commission; the need to avoid unwarranted sentence disparities among defendants with similar
records who have been found guilty of similar conduct; and the need to provide restitution to any
28   victims of the offense.

13

1   number of hospitals, all of which defendant can go should he need regular checkups for possible

2   post-COVID-19 related issues.  (*Id.* at 10.)  Moreover, defendant asserts that he is not generally a

3   danger to the community, and that his strong familial relationships and older age make him a

4   significantly lower risk of recidivist conduct.  (*Id.* at 10, 25.)  Lastly, he contends that if his

5   request for release were granted, it would lower BOP's costs, because diagnostic tests will need to

6   be run to determine what, if any, long term damage was caused by his contraction of COVID-19

7   and the BOP has already incurred significant costs in testing and treating him due to the virus.

8   (*Id.* at 25–26.)

9        The government counters that a reduction of defendant's sentence would not be consistent

10  with consideration of the § 3553(a) sentencing factors.  First, the government notes that defendant

11  has now been convicted three times of engaging in criminal activities involving controlled

12  substances, and that defendant "has demonstrated that punishment does not deter his criminal

13  conduct."  (Doc. No. 174 at 20.)  The government also discounts defendant's rehabilitation

14  efforts, noting that "defendant's records show schooling he achieved while incarcerated during

15  his first prison sentence.  Such measures did not prevent the defendant from re-offending."  (*Id.*)

16  The government also notes that "the probation officer recognized that while the defendant can

17  apparently function as a productive member of society, at least while under community

18  supervision; when faced with financial difficulties, he apparently returns to drug trafficking."  (*Id.*

19  at 21.)

20       Defendant Fleck's criminal history prior to this offense includes prior convictions related

21  to possession of marijuana, involvement in a continuing a criminal enterprise for which he was

22  sentenced to 300 months in BOP custody, and possession/purchase for sale of a narcotic

23  controlled substance in a case involving a large amount of cocaine and methamphetamine.  (Doc.

24  No. 102 at 10–11.)  In light of this background, consideration of the risk of recidivism weighs

25  significantly against the granting of compassionate release.  *See, e.g.*, *United States v.*

26  *Drummondo-Farias*, No. 1:12-cr-001740-JMS, 2020 WL 2616119, at *6 (D. Haw. May 19,

27  2020) (denying compassionate release to a defendant in part because had been twice convicted of

28  drug offenses).

14

1       In addition, the court is not persuaded that defendant has established his post-offense

2   rehabilitation since his sentencing.  When defendant was sentenced, the court recommended

3   participation in the 500-Hour Bureau of Prisons Substance Abuse Treatment Program.  (*See* Doc.

4   No. 115 at 2.)  Defendant contends that has completed a drug abuse education program, but that

5   program was only twelve hours. (Doc. Nos. 173 at 11–12; 173-5.)   Additionally, defendant

6   asserts that he has not been subject to any incidents while incarcerated and that he has completed

7   an A.C.E. Creative Writing Program and the California Commercial Truck Driving Program.

8   (Doc. Nos. 173 at 11–12; 173-5.)  Some courts have granted compassionate release where

9   defendants in those cases have participated in similar programs.  *See Parker*, 461 F. Supp. 3d at

10   982 (granting a defendant compassionate release in part because he demonstrated rehabilitation

11   during his imprisonment by earning two associate degrees, participating in other continuing

12   education courses and working as an education instructor, "suicide companion," and career

13   services clerk) (collecting cases).  While the court acknowledges these efforts on the part of

14   defendant Fleck are laudable, the court recognizes that even actual rehabilitation alone is not

15   enough to warrant compassionate release.  *See* 28 U.S.C. § 994(t); U.S.S.G. § 1B1.13, cmt. n.3.

16       As of the date of this order, defendant Fleck has served only about 61 months of his 151-

17   month sentence, or approximately 40 percent of the sentence imposed.  (*See* Doc. No. 174 at 7.)

18   "'The length of the sentence remaining is an additional factor to consider in any compassionate

19   release analysis,' with a longer remaining sentence weighing against granting any such motion."

20   *United States v. Shayota*, No. 1:15-cr-00264-LHK-1, 2020 WL 2733993 at *6 (N.D. Cal. May 26,

21   2020) (quoting *United States v. Connell*, No. 18-cr-00281-RS-1, 2020 WL 2315858, at *6 (N.D.

22   Cal. May 8, 2020)); *see also United States v. Lonich*, No. 1:14-cr-00139-SI-1, 2020 WL

23   26148743, at *3 (N.D. Cal. May 21, 2020) (denying motions for compassionate release, noting,

24   "the Court finds it significant that defendants have served far less than half of their sentences").

25   In the court's view, a reduction of defendant's 151-month sentence effectively to one of a little

26   over five years would not adequately reflect the seriousness of his offense of conviction, promote

27   /////

28   /////

15

1    respect for the law, provide just punishment, or afford adequate deterrence to criminal conduct.[11]

2    *See United States v. Purry*, No. 2:14-cr-00332-JAD-VCF, 2020 WL 2773477, at *2 (D. Nev. May

3    28, 2020); *Shayota*, 2020 WL 2733993 at *5; 18 U.S.C. § 3553(a).

4    　　　Thus, on balance, the court finds that granting defendant's motion and reducing his

5    sentence to one of time served would not be consistent with the § 3553(a) sentencing factors.

6    **CONCLUSION**

7    　　　Because defendant Fleck has failed to demonstrate that "extraordinary and compelling"

8    reasons exist justifying a reduction of his sentence under 18 U.S.C. § 3582(c)(1)(A) or that such a

9    reduction at this time would be consistent with the sentencing factors set forth in 18 U.S.C.

10   § 3553(a), his motion for compassionate release (Doc. No. 168) is denied.

11   IT IS SO ORDERED.

12   　　Dated:   **November 23, 2020**                                    _____

13   　　　　　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE

14

15   ────────────────────

[11] Defendant requests that the court amend the conditions of his supervised release to require him
16   to serve the remaining portion of his custodial term on home confinement, or alternatively, to
     modify his sentence to include home confinement and/or electronic monitoring until a vaccine or
17   treatment protocol for COVID-19 is developed.  (Doc. No. 173 at 2, 27.)  First, the CARES Act
     "'authorizes the BOP—not courts—to expand the use of home confinement' under 18 U.S.C. §
18   3624(c)(2)."  *United States v. Fantz*, No. 5:14-cr-32-BR, 2020 WL 3492028, at *1 (E.D.N.C.
     June 26, 2020) (quoting *United States v. Nash*, No. 19-cr-40022-01-DDC, 2020 WL 1974305, at
19   *2 (D. Kan. Apr. 24, 2020) (collecting cases)); *see also United States v. Rice*, No. 12-cr-818-PJH,
     2020 WL 3402274, at *4 (N.D. Cal. June 19, 2020) (denying a defendant's request for release to
20   home confinement made in conjunction with his motion for compassionate release because "the
     court has no authority to designate the place of confinement" because the "Bureau of Prisons has
21   the statutory authority to choose the locations where prisoners serve their sentence."); *United
     States v. Gray*, No. 4:12-cr-54-FL-1, 2020 WL 1943476, at *3 (E.D.N.C. Apr. 22, 2020) (holding
22   that the CARES Act "does not authorize the court to order defendant's placement in home
     confinement").  The district court may only impose home detention as a condition of supervised
23   release, rather than as part of a sentence of imprisonment.  *See Connell*, 2020 WL 2315858, at *5,
     n.6 & *7.  Accordingly, to do as defendant requests, the court would be required to reduce his
24   sentence to one of time served (i.e., 61 months) and modify the conditions of supervised release
     to require home confinement for 90 months.  The court is unwilling to do so for the reasons set
25   forth above.  The BOP knows its capabilities to effectively and appropriately care for defendant
     Fleck in a custodial setting.  If the BOP determines that the defendant should be released to home
26   confinement to serve his sentence under the Attorney General's expanded authority in that regard
     (*see* fn. 2, above), the court trusts it will do so.  The issue that this court resolves is merely
27   whether in its view, under the applicable legal standards, defendant's sentence should be reduced.

28